IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRIGNIA
*Norfolk Division*

UNITED STATES OF AMERICA

v.                                                                      Docket No: 2:25CR00044

GRACE PARADIS,

            Defendant.

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

Defendant, Grace Paradis ("**Ms. Paradis**" or the "**Defendant**"), by and through her attorney, Brian M. Latuga, Esq., in accord with 18 U.S. C. § 3553(a), files this Position with Respect to Sentencing in the instant case. The Presentence Investigation Report (the "**PSR**")[1] has been reviewed and there are no objections to the advisory guideline's offense level of 43, criminal history category I, and recommended guideline range of 360 months (restricted). Ms. Paradis respectfully submits that a variant sentence of the mandatory minimum - 180 months - is reasonable as to her and appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553.

### 18 U.S.C. § 3553(a) – Factors to Consider at Sentencing

In determining the appropriate sentence to impose, this Court must follow the guidance of the United States Supreme Court in *Gall v. United States*, 552 U.S. 38, 50 (2007):

> *(The) district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an*

---

[1] The Presentence Investigation Report filed on January 21, 2026 (Doc. 69), and updated with amendments on May 13, 2026, (Doc. 88).

1

*opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.* (Citation and footnote omitted).

Analysis of the factors set forth in 18 USC §3553(a) support the result which this defendant seeks. This is the general directive for the Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing, but no more than that. Accordingly, so long as this Court determines that Ms. Paradis' sentence is sufficient as to her, and his conduct, the sentence is appropriate for purposes of 18 U.S.C. § 3553(a).

## I.    Nature and circumstances of the offense and history and characteristics of the defendant

**The Offense Conduct**

Ms. Paradis stands by her plea; she acknowledges her guilt, and nothing in this Position of Sentencing is intended or should be viewed to diminish the wrongfulness that she did, the great sorrow she has for her actions and the effect upon her children, or the acceptance of responsibility and punishment that she burdens. Notwithstanding that recognition, Ms. Paradis respectfully submits that the mitigating and extenuating facts and circumstances below are significant and heavily militate in favor of the 180-month sentence that is requested.

The facts and circumstances of the offense are accurately and thoroughly set out in the "Offense Conduct" section of the PSR, ¶ 10. This series of tragedies was spearheaded by the co-defendant Cory Richard Hambley (2:25CR00044-001)[2]. And while Ms. Paradis willingly participated in his demands for continually more salacious and disturbing materials, she was clearly manipulated through her desire for stability and intimacy, her lack of money to care for herself or her family, and her severe history of mental health issues and abuse.

The Signal App messages between Ms. Paradis and Mr. Hambley constituted 4,919 pages of printed (PDF) messages. The messages are a window into the mental and physical worlds of both Hambley and Paradis. It is exceptionally clear that the two maintained a semblance of a long-distance relationship through the entire period of time from January 15, 2023 to October 22, 2024. However, before Signal, there were text messages. What also is clear – Hambley pursued, manipulated, and groomed Paradis to do his bidding.

Cory Hambley actively pursued and hunted Ms. Paradis. She did not invite him back into her life. [**See Text Messages, Exhibit B**]. Hambley tells Paradis that he's been trying to find her for years, and that it was "insanely difficult" to find her number. He tried "many different ways" to find her. Further in the conversation, it becomes evident that he hired a private investigator to help find her, and she questions what information he was able to get. *Id*. He immediately offered Paradis money when she noted her financial struggles, starting his process of gaining control over her. Hambley eventually, over Paradis' skepticism and criticism, convinces Paradis to move the conversation over to "Signal," a secure chat platform.

Hambley was a married man with ideas of Paradis becoming a 'sister wife.' Throughout the messages, Paradis connects financial assistance to sexual access to her, proposing that he buy

---

[2] Mr. Hambley has been sentenced by this Court (2:25-cr-00044) to a total term of 360 Months on Count 1, 420 Months concurrent on Count 10, and 25 years of supervised release. (Doc. 84).

her a mobile home in exchange for intimacy, after Hambley had offered money in exchange for explicit content. Paradis is clearly submissive to Hambley, referring to him as "Daddy," discussing spanking, the bruises he has left on her in the past. Paradis references her emotional brokenness; the pain identified with past incidents of painful and harmful past non-consensual anal sex[3] and acknowledged the risk and discomfort of Hambley's requests several times. She makes it clear, at times, that she was not "disobeying" him by some of her objections. *See, infra*.

Hambley's abuse and manipulation of Paradis began when they met during her military service in 2001, when he subjected her to sexual abuse and rape, she became pregnant and miscarried a child of his. (PSR ¶ 92). She was diagnosed with bipolar disorder and discharged in 2002, but the abuse from Hambley continued until hearing from him briefly in 2011, and then again when Hambley texted Paradis in November 2022 (PSR ¶ 10 sub. 6), and [**Exhibit B**].

Hambley would persistently demand more explicit content, commitment, and risky behaviors from Paradis while the conversation on Signal continued. Paradis' barriers and 'rules' broke down throughout the conversation, and in exchange for support, love, and feigned companionship, she would lean into his requests, produce them, and ensure she was making HIM happy for their long-term future as a "married" couple. Hambley mailed Paradis a camera to have her record MV1 and MV2. He enjoyed the "incest" aspect of her childhood past, and of his demands for her to shower with MV1 and MV2, increasing the sexual nature of each request.

Responses to Hambley's requests were initially strong rejections. Paradis would reject sending images and videos that Hambley desired and reject the notion of doing so. Without

---

[3] Paradis: "You had a year and a half, and the closest you got to meeting my needs was purposely fucking my ass, without proper lubrication, to hurt me as much as possible, on purpose, and cumming in my ass. You aren't able to satisfy anything, so what's the point?" and reiterating again, "Being fucked in the ass, raw, was physically painful, but the other things hurt me much more deeply on an emotional level, and I didn't stop talking to you until I was completely broken."

responding to Paradis' message, Hambley would simply demand the same images or videos again, dismissing any conversation and reiterating his requests, repeatedly. Paradis' responses went from "No. It puts me at too high a risk of jail and never seeing my kids again," to acquiescence and knowing enablement of Hambley's desires. He took advantage of the childhood that he knew Paradis had, as she had disclosed that to him repeatedly that she had been "groomed" and abused as a child. [**Exhibit A, Fig. 1**] Further that she had been groomed to handle physical abuse and verbal abuse, but not to handle emotional abuse, "because it has the opposite of the desired effect."

Paradis refused to produce child-related content on multiple occasions and articulated her own legal awareness in doing so. In fact, while she acquiesced to Hambley's demands several times, and seemed very willing to make him happy, she also continued to refuse his demands and note her protection of her children, and her knowledge of the legal consequences; while she did acquiesce, and enjoyed the attention she received from Hambley because of it, her objections to Hambley's demands also became stronger over time. [**Exhibit A, Figure 1**]. Paradis states clearly to Hambley on September 4, 2023, "[t]here have also been times I've had to protect you from your own stupid impulses, when I've had to explain the imminent certainty of jail for certain requests you've made of me."

On January 30, 2024, in the same day's exchanges, Hambley requests: *"I want the real thing"* (in context of involving [CHILD]).

Paradis responds to him: *"Well, you can have it, when it won't land you in jail."*

Hambley pivots and requests videos involving the girls:

*"Well, same thing... you can have it, when it won't land ME in jail too."*

This is followed by Paradis:

*"So once again, I have to explain, that I'm protecting you from yourself, and protecting our plans... **NOT disobeying you.**"*

Paradis endured the physical and emotional abuse from Hambley, she concealed bruises from others with long dresses, hiding it from her children and doctors. Hambley continually reassured Paradis she would not get into trouble for doing things for him. [**Exhibit A, Fig. 1;** January 30, 2024; **Fig. 2**, July 30, 2024]. Rather than responding to her questions and responses, he would simply restate his requests for her to produce illicit materials. Hambley had no regard for the damage he wanted to inflict; his own satisfaction took precedence. Paradis did these things knowingly, willingly, acknowledging their wrongfulness and the damage it could and would cause. However, it was only through manipulation and Hambley's knowledge of Paradis and her disturbed past that he was successful. He gained compliance with criminal requests through his power over Paradis.

Paradis did not save or stockpile and CSAM on her devices. The distorted pleasure gained from these events all resided with Hambley.

Paradis became keen on Hambley's continued power over her, his abusive patterns with her, and the position she had placed herself in with the requests she agreed to with him. [**Exhibit A, Fig. 2**]. Paradis would continually reference the bruises the Hambley left on her, differentiating them between sexual bruises and bruising for the purpose of abuse and control. [**Exhibit A, Fig. 3**].

The signal messages between Paradis and Hambley show that Hambley took advantage of the framework of sexual grooming put in place through decades of Paradis' childhood trauma, and continued trauma that she endured through adulthood both through Hambley himself, and others who have capitalized on her mental health. Her background, characteristics, and medical history

show that she was extremely susceptible to this kind of influence, and indeed, Hambley was good at exerting it.

### *Personal and Family Characteristics*

Ms. Paradis is before this Honorable Court at the age of 43 years. She has limited family support, was abandoned several times as a young child and adult, and is the mother of two young men, and two girls. (PSR ¶¶ 63, 65). She raised her boys as a sole provider since birth. (PSR ¶ 63). Her two girls are the subject of this matter and have been in her sole care, and one was involved in significant custody litigation, winning custody over the father. (PSR 64, 65).

Ms. Paradis is the result of an unfortunate, abusive, and unstable childhood, seemingly wandering aimlessly through life with a cornucopia of issues from family, relationships, work, mental health, physical health, childrearing, gullibility, and instability. Fortunately, she has not been the type to engage in substance abuse or dependency on harmful *substances*; but she has certainly become dependent upon harmful *people*.

The PSR captures eloquently the deep, emotional, and troubled past that precedes Ms. Paradis before this court. Within the last 11 years she has lost her father and her mother, both of whom either had mental health or substance abuse issues and led the charge on the abuse she became face-to-face with through childhood. (PSR ¶ 57, 60). She lost one brother to drowning at a young age and is estranged completely from her other siblings. (PSR ¶ 58, 59). She has 3 living brothers, one paternal half-brother, a maternal half-brother, and 3 step-siblings; none of whom are in contact with her or supportive of her. *Id*.

She is the product of divorced parents, and mother's remarrying a "terrible person" with substance abuse addiction; a shared trait with her mother. (PSR ¶ 60). She is the victim of repeated

7

sexual abuse as a child; the details of which are daunting, disturbing, and terrifying for any child to endure or adult to conceptualize. (PSR ¶ 60).

Ms. Paradis has experienced homelessness as a child, bullying, abuse, sexual abuse, unstable housing (PSR ¶ 60, 112), and was formally emancipated when she was 16 years old in Granville, NY. (PSR ¶ 61, 113).

She obtained her GED after leaving High School in the 10th Grade, (PSR ¶ 87-88), and did obtain some post-high school college education. (PSR ¶ 90). Early in her life she attempted to succeed in the United States Navy, enlisting in 2001, being discharged for bipolar disorder in 2002. (PSR ¶ 92). Ms. Paradis has been married three times, each for a very short amount of time. (PSR ¶¶ 63-65).

In 2001 and 2002, Grance Paradis was reportedly sexually abused by Cory Hambley while in the United States Military. She obtained military protective orders against him, but was warned not to pursue anything further, lest her career prospects be lost. (PSR ¶ 93).

As one might expect from such a difficult and turbulent upbringing, Ms. Paradis' work history is just as turbulent and varied; while her most prized, and now most-damaged, role has been being a full-time mother. (PSR ¶¶94-100).

### *Defendant's Health, Depression and Drug Use*

Ms. Paradis had been seen at several facilities for medical and mental health services throughout her lifetime (PSR ¶¶ 68-70, 75-80). She began mental health services at age 6 after being exposed to significant sexual abuse. She received treatment from childhood through adulthood, at providers like Glens Falls Family Health in New York, and other counseling services.

(PSR ¶¶ 77-84). In 2001, while enlisted in the US Navy, she was diagnosed with bi-polar disorder and discharged because of that diagnosis. (PSR ¶ 92).

Her record from Glens Falls psychological counseling discusses several important topics about her background. She discussed in 2010 the "trauma memories [that a male] caused from being a multiple rape victim in her past," and "not knowing what 'normal' is." She also worked on decreasing her contact with her ex-husband and boyfriend, the therapist noting that she "*lacks insight into how to avoid engaging in contact with them and hot to establish firm boundaries.*" She was working on parenting skills with books but struggled with time management and organization. In 2011 she discussed "correcting thinking errors from past trauma experiences…" feeling vulnerable and not assertive.

Continuing in 2015, Paradis' counselor noted that Paradis "wrote a long letter to her 'boyfriend' which she asked this writer to read…" noting the "obsessive behaviors" and "unhealthy attachment to her ex-boyfriend." She was continually obsessive, exhibited decreased motivation, increased anxiety, paranoia, the feeling of being overwhelmed, anxiety, trauma, racing and irrational thoughts, and panic attacks. She also discussed in 2015 her motor vehicle trauma suffered in 2001 and resulting head injury (re: PSR ¶75). She exhibited "lots of relationship stress," lack of self-worth, and discussed her "past history and abuse history" frequently. Particularly discussing her "past history of being sexually assaulted by her father."

Ms. Grace Paradis's combined mental health and medical records reflect the long-term picture of a working mother of four navigating a complex web of conditions while contending with extraordinary life stressors. Across nearly five years of documented care—mental health treatment at Meridian Psychotherapy Services from October 2020 through July 2023, and medical care across multiple Sentara facilities from October 2022 through May 2025—her recent medical

records show a woman who consistently sought treatment, complied with medication when she could afford it, denied any history of substance abuse, and continued to function as primary caregiver to her children through divorce, job loss, loss of insurance, post-COVID illness, recurrent chest pain, and ongoing cancer-surveillance findings.

Ms. Paradis is a retired military servicewoman who, during the period of these records, was working toward completing her college degree, raising four children, and cycling through periods of employment, unemployment, and physical labor (house cleaning), and expressing a wish to return to construction work. She is a former smoker (quit January 2014). Her family history is heavy on both sides: ADHD (son, brothers, father, paternal aunt), depression, anxiety, bipolar disorder, and substance abuse in her mother; and an exceptional cardiac history—paternal grandfather died at 39, brother had a heart attack at 29, father died of heart attacks at 41, twin brother with heart problems, and multiple family valve abnormalities. She also has documented family history of breast and uterine cancer.

She has a remote history of traumatic brain injury sustained in a motor vehicle accident, with documented loss of consciousness and hospitalization. There is no record of any post-TBI rehabilitation following the initial neurological injury- a gap her treating psychiatric provider explicitly recognized as relevant to her ongoing cognitive and executive function difficulties.

Ms. Paradis was treated by Bridget Peery, NP and later Danielle Gange, NP-C primarily for Attention-Deficit/Hyperactivity Disorder, a longstanding neurodevelopmental disorder with onset before age 12 that had affected her across school, work, relationships, and daily responsibilities. She was treated long-term with Vyvanse (40–50 mg) and intermittently with clonidine for sleep, anxiety, and autonomic hyperarousal. In November 2020, she disclosed her

remote TBI history; her provider recommended neuropsychological testing to differentiate ADHD symptoms from cognitive sequelae of TBI, but she was unable to complete this testing.

Beginning March 2021, she began experiencing intrusive distressing memories, hypervigilance, autonomic hyperarousal, sleep disturbance, and a persistent sense of being "on edge, jumpy, waiting for the other shoe to drop." A Rule-Out diagnosis of Post-Traumatic Stress Disorder was added and remained on her active problem list throughout treatment. Her provider used therapeutic interventions targeting "the childhood roots of current feelings and behaviors," indicating the provider's clinical concern about early-life trauma.

Two days after her July 2021 appointment, Ms. Paradis lost her job and her health insurance. Without coverage she could not afford Vyvanse and was forced off her ADHD medication for approximately nine months. When she re-established care in April 2022 with Medicaid coverage, a urine drug screen and Prescription Monitoring Program check confirmed treatment compliance and the absence of any drug misuse. She had gained approximately 27 pounds during the unmedicated period.

Her divorce was finalized in October 2022. She consistently denied suicidal or homicidal ideation. She maintained custody of all her children, used several elaborate compensatory strategies (notebooks, calendars, reminders) to manage her ADHD, and engaged appropriately with treatment when access permitted.

Ms. Paradis established primary care in October 2022 with Dr. Erin Healy at Sentara Family Medicine. Initial diagnoses included primary hypertension and migraine. She contracted COVID-19 in December 2022, after which her blood pressures climbed persistently into the 140/100–155/95 range despite medications. In February 2023 she presented to the Sentara Independence Emergency Department by ambulance after waking with crushing chest pressure

she described as "like someone was sitting on my chest, comparable to childbirth." Cardiac workup was negative; her ADHD and anemia diagnoses were formally entered.

Over the following months, Ms. Paradis underwent a substantial diagnostic workup: a colonoscopy at Sentara Leigh Hospital that identified and removed an 18–20 mm "sessile polyp," which required follow-up. A second chest pain ED visit in March 2023. She obtained echocardiograms and an abdominal MRI revealing a 2.7 cm splenic cyst, bilateral renal cysts, and indeterminate small liver issues that required follow-up. She endured a July 2023 ED visit for falls sustained while helping carry a washing machine downstairs; an August 2023 ED visit for Urinary Tract Infection; and a comprehensive cardiology consultation with Dr. Ronald Stine in August 2023.

In January 2024, an annual screening mammogram showed a possible right breast mass; diagnostic mammogram and ultrasound on January 24, 2024 found a 1.5 cm probably benign cluster of microcysts (BI-RADS 3), with the patient documented as being at "elevated risk of developing breast cancer" given her family history and requiring six-month follow-up imaging. A February 2024 ED visit was for dental pain. It is clear that Ms. Paradis didn't have consistent dental care or coverage for it.

By her September 2024 cardiology follow-up, she was documented as having been off all her medications and not seeing her PCP since that physician went on maternity leave; she was working cleaning houses at the time.

All of her medical records paint a well-documented picture that can be traced to her childhood. She has consistently struggled to continue with medications when cost, insurance lapse, or provider issues were present. She has not been a drug abuser or seeker. Her extraordinary stressors in her most recent adult life were immense – contested divorce, custody cases, protecetive

orders, loss of employment and insurance, COVID symptoms, chest pains, and cancer surveillance and follow-up in several parts of her body. She has been psychiatrically vulnerable, having limited resources, a lot of difficulties, and consistent attention to the needs of her children.

This is exactly what Mr. Hambley chose to capitalize upon, especially knowing Ms. Paradis' early history.

Compassion in issuing a sentence does not diminish the seriousness of the offense. Over time, and with the help of programs offered by the Bureau of Prisons, and counseling upon reentry to society, she will be equipped with the tools necessary to battle her mental and psychological issues. It does not take a guideline sentence, or a maximum sentence, to provide treatment and rehabilitative services to address the real root of Ms. Paradis' problems.

### *Psychosexual and Mitigation Reports*

Attached as Exhibits, are reports drafted by Dr. Alana Hollings, Psy. D., C.S.O.T.P. These evaluations and opinions by Dr. Hollings address Ms. Paradis' mental status and behavioral background, her personality, and offer a summary and recommendations. There are two reports, a *Psychological Evaluation*, and a *Psychosexual Evaluation*. In summary, Dr. Hollings writes in the Psychological Evaluation [**EXHIBIT C**], that Ms. Paradis states that she is consumed with a great deal of regret, guilt and anger. (p.2). Dr. Hollings opines that some individuals with substantial child abuse or trauma histories have elevated scores on the "Atypical Response" scale due to atypical or extensive symptomatology sometimes associated with posttraumatic disturbance. This is likely the case with Ms. Paradis." (p.5). Ms. Paradis is experiencing many symptoms associated with a history of trauma, intrusive symptoms (like flashbacks), that are "easily triggered by current events." Ms. Paradis has "limited capacity to form close relationships

13

with other people. She may be concerned about being rejected in interpersonal situations and abandoned by loved ones." (p.6) And, "***Ms. Paradis is susceptible to being influenced by others***. She may view herself as a fragile or vulnerable person." *Id*.

Dr. Hollings lists a series of **mitigating factors in her Psychological Evaluation, on page 7**. Some of those twenty-three (23) mitigating factors include: Parents separated when she was a young child; mother and stepfather abused illicit drugs; physical and sexual assault; beatings and sexual molestation/ rape; neglected and deprived of food; loss of an older borther to drowning; abandonment; miscarriages; two sons on the autism spectrum; numerous trauma symptoms and diagnosed with PTSD; *and others*.

In the Psychosexual Evaluation [**Exhibit D**], Dr. Hollings opines that "[t]he results did not suggest high sexual interest in prepubescent minors (ages 13 and younger)," and the cognitive distortions score "fell in the non-problematic/ low range indicating Ms. Paradis *did not* endorse justifications or excuses frequently used by individuals who are sexually involved with children." *Id*. at 9 (emphasis in original). On the "Danger Registry" – measuring attraction to, fantasies about, and sexual interest in young girls and boys – "No moderate or severe concerns were identified. *Id*. And on a "Justifications Scale" – "Ms. Paradis did not endorse any justification for having committed a sexual offense. She shows some contrition for her behavior." *Id*. at 11.

## II.      General purposes of sentencing - 18 USC §3553(a)(2)

The remaining sentencing factors under 18 U.S.C. §3553(a)(2) address retribution, deterrence, incapacitation, and rehabilitation. *See Tapia v. United States*, 564 U.S. 319, 325 (2011).

Fifteen years imprisonment (180 months), coupled with mental health treatment and medical intervention, is sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

*The seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

Ms. Paradis has pled guilty to a negotiated plea agreement and accepted responsibility for her actions to U.S. Probation and to this Honorable Court. Ms. Paradis has no prior criminal record. Ms. Paradis fought to protect her children from dangerous fathers through protective orders, custody hearings, and by making herself the sole caretaker when necessary – and that was all wiped away with her decisions to permit Hambley's manipulation of her. Ms. Paradis fully recognizes the need for punishment and accepts that; her actions and individual decisions have caused every bit of her children's pain, discomfort, fear, and loss of trust in others. She is now faced with the grim reality of a minimum of 15 years in prison for her actions. Ms. Paradis is cognizant that her actions demand punishment, and that her decisions were her own. A 15-year sentence is sufficient to promote respect for the law and to provide just punishment for these very serious and reprehensible offenses.

*To afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant*

As to this Court's requirement to consider the *need* to "afford adequate deterrence to criminal conduct" in the imposition of a sentence, the general deterrence is, empirically, not effective on society unless one is under the threat of criminal prosecution.

> The findings regarding general deterrence are relatively settled. The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate.… It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). In fact, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203.

> Thus, deterrence properly informs sentencing only to the extent that it requires a hardship to be imposed for criminal offending. It does not require a particularly burdensome penalty, merely one that people would seek to avoid. That aim could be satisfied by a fine or a short prison term. There is no foundation for increasing penalties to reduce the crime rate.

*Id.*, at 1205; *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) (reviewing recent literature and concluding that "evidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment.").

A sentence longer than 180 months is not necessary to increase deterrence. Research indicates that increases in the severity of punishment are far less important to producing deterrent effects than the certainty of punishment (if severity is relevant at all). *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing

16

Project, at 1 (Nov. 2010), *available at* http://www.antoniocasella.eu/nume/Wright_2010.pdf (last visited January 24, 2023).

In 2016, even the Department of Justice confessed in its publication on deterrence that "[i]ncreasing the severity of punishment does little to deter crime," acknowledging that "[l]aws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective." *See* U.S. Dept. of Justice, *National Institute of Justice Five Things About Deterrence* (May 2016), *available at* https://www.ojp.gov/pdffiles1/nij/247350.pdf (last visited January 24, 2023).

In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). So general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine or a short prison term." *Id*. This prosecution has already achieved both specific and general deterrence. A prison sentence beyond 180 months is not – in the parlance of § 3553(a) – "necessary" to achieve those objectives.

According to these professionals, no data suggests a reason to impose a sentence of considerable length simply to deter society at large.  Because U.S.C. § 3553 requires the sentence be sufficient, but not *greater than necessary* to conform with the sentencing factors, a mandatory minimum sentence provides adequate general deterrence.

*To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

Ms. Paradis is educated and has the capacity to learn. However, she suffers from significant mental health maladies and is overcome by these thoughts and feelings, dealing with the traumas of her past. Now, she must deal with the traumas of her present. Ms. Paradis can benefit from mental health counseling in the prison system, vocational training, and medical care for her heart, pre-cancerous cells, and other medical issues she has faced for several years.

### III.    Kinds of sentences available – 18 USC § 3553(a)(3):

Because the Defendant falls under "Zone D" the minimum term given must be served in prison. U.S.S.G. § 5C1.1(f). This does not however prevent this Court, after determining the appropriate guideline calculation, to grant any further ordered sentence outside imprisonment. Accordingly, the Court could impose the minimum, and if inclined to impose a longer sentence, consider a subsequent sentence of community confinement or a period of home detention.

The Defendant's ability to pay any fine are non-existent as she must provide for herself during a minimum of 180 months of imprisonment. Due to the nature of her conviction and registry under the Sex Offender Registry and Notification Act, finding lucrative employment will likely be a struggle for Ms. Paradis. Accordingly, the Court is permitted to impose no fine "where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine." (U.S.S.G. § 5E1.2(a)). "The determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine." (U.S.S.G. § 5E1.2 (Commentary, 3)). Accordingly, it would be appropriate in this case to waive any fine.

18

IV.    <u>**Relevant Guidelines – 18 USC § 3553(a)(4)**</u>

The possible sentences and applicable guidelines are set forth in the PSR. And there are no objections to the calculations of those guidelines.

V.    <u>**Pertinent Policy Statements. 18 USC §3553(a)(5)**</u>

None known to the Defendant.

VI.    <u>**The Need to Avoid Unwarranted Disparities Among Similar Offenders**</u>

Ms. Paradis urges the Court to consider her role in the offenses, her history, and her characteristics when sentencing, and as compared to other offenders with similar conduct in this and other districts.

    a.  2:25-CR-00044; United States v. Corey Hambley

    b.  Cory Hambley is the co-defendant in this matter.

    c.  Sentenced by this Court as follows: **Count 1**, Imprisonment: Three Hundred Sixty (360) Months; Supervised Release: Twenty-Five (25) Years; Special Assessment: $100.00; Restitution: To be determined; **Count 10**, Imprisonment: Four Hundred Twenty (420) Months to be served concurrent to Count 1; Supervised Release: Twenty-Five (25) Years to run concurrent to Count 1; Special Assessment: $100.00; Restitution: To be determined. is matter.

    d.  Cory Hambley has been extensively discussed, *supra*, and is the 'ringleader' of his sycophantic fantasies and relationships with women; having gained advantage over women, exploiting their weaknesses to access their bodies, and the bodies of those children around the women. Hambley maintained a stock pile of CSAM images and

videos, caused others to create them for his sexual pleasure, and exploited every avenue he could imagine. Hambley used Ms. Paradis for this very purpose, and succeeded; destroying Ms. Paradis' life and that with her children.

## VII.    Restitution. 18 USC §3553(a)(7)

Ms. Paradis agreed, and clearly it is mandatory, that restitution be paid for the full amount of the victims' losses.

**<u>Conclusion</u>**

This Court is respectfully urged to impose a sentence of the mandatory minimum period of incarceration required by this offense, the minimum term of supervised release, and to order Ms. Paradis to participate in mental health treatment at the Bureau of Prisons.  Under these circumstances, it is unnecessary to impose a sentence that is greater than what is requested. Ms. Paradis certainly understands that there will be serious consequences for her criminal activity, and the horrible affect her decisions have had upon her children and family, but hopes that once she has served her sentence, she will be able to again be a responsible member of society.

Respectfully submitted this 14th day of May, 2026.

**GRACE PARADIS**

By: _____/s/_____

Brian M. Latuga, Esquire
VSB #86300
**WOLCOTT RIVERS GATES**
4417 Corporation Lane
Virginia Beach, VA 23462
Telephone: 757.497.6633
Facsimile: 757.497.7267
E-mail: blatuga@wolriv.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of May, 2026, I electronically filed the foregoing Defendant's Position on Sentencing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

E. Rebecca Gantt, Esq.
Assistant U.S. Attorney
VSB No. 83180
101 West main Street, Suite 800
Norfolk, Virginia 23510
Rebecca.gantt@usdoj.com

With further copy by electronic mail to:

Kalyn M. Monreal
United States Probation Office
600 Granby Street, Suite 200
Norfolk, VA 23510
Kalyn_monreal@vaep.uscourts.gov

_____/S/_____
Brian M. Latuga, Esquire
VSB #86300
WOLCOTT RIVERS GATES
4417 Corporation Lane
Virginia Beach, VA 23462
Telephone: 757.497.6633
Facsimile: 757.497.7267
E-mail: blatuga@wolriv.com
*Counsel for Defendant*